**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN**

YANICK ST. JEAN,

        Plaintiff,

    v.                                        Case No. 06-C-0990

THE BOARD OF REGENTS OF THE
UNIVERSITY OF WISCONSIN SYSTEM,
HELEN ROSENBERG and
ANNE STATHAM,

        Defendants.

---

**DECISION AND ORDER ON THE DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT**

---

Plaintiff Yanick St. Jean filed this action claiming that the defendants subjected her to unlawful discrimination based upon her national origin, color, and race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended, and subjected her to unlawful retaliation for activities protected by Title VII. The plaintiff also asserts that the defendants violated her right to make and enforce contracts and to enjoy the full and equal benefit of all laws and proceedings for the security of person and property as is enjoyed by white citizens under 42 U.S.C. § 1981. In addition, the plaintiff seeks to redress violations by the defendants under the First Amendment to the United States Constitution and the Equal Protection and the Due Process Clauses of the Fourteenth Amendment pursuant to 42 U.S.C. § 1983.[1]

---

[1]In her brief in opposition to the defendant's motion for summary judgment, the plaintiff voluntarily withdrew her claim for retaliation under Title VII as well as her First Amendment claim.

The defendants have filed a motion for summary judgment. The motion is fully briefed and will be addressed herein.

## SUMMARY JUDGMENT STANDARD

Summary judgment shall be granted if the pleadings, depositions, answers to interrogatories, admissions on file and affidavits, if any, establish that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); McNeal v. Macht, 763 F.Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those facts that under the applicable substantive law "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. The burden of showing the needlessness of a trial – (1) the absence of a genuine issue of material fact and (2) an entitlement to judgment as a matter of law – is upon the movant. In determining whether a genuine issue of material fact exists, the court must consider the evidence and all reasonable inferences in the light most favorable to the nonmoving party. See Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., Ltd., 475 U.S. 574, 587 (1986), Matter of Wade, 969 F.2d 241, 245 (7th Cir. 1992). However, when the nonmovant is the party with the ultimate burden of proof at trial, that party retains its burden of producing evidence which would support a reasonable jury verdict. Anderson, 477 U.S. at 267; see also, Celotex Corp., 477 U.S. at 324.

The evidence relied upon in a motion for summary judgment must be of a kind that would be admissible at trial. See Waldridge v. American Hoechst Corp., 24 F.3d 918, 921 n.2 (7th Cir. 1994) (citing Gustovich v. AT & T Communications, Inc., 972 F. 2d 845, 849 [7th Cir. 1992]). "Hearsay is inadmissible in summary judgment proceedings to the same extent that it is inadmissible in a trial." Eisenstadt v. Centel Corp., 113 F.3d 738, 742 (7th Cir. 1997). Thus, any

- 2 -

proposed findings of fact which do not set forth facts that "would be admissible in evidence" have not been included in the relevant facts. Fed. R. Civ. P. 56(e)(1).

To the extent that an objection to a proposed finding of fact fails to cite specific evidentiary support, the objection has no weight. See Schneiker v. Fortis Ins. Co., 200 F.3d 1055, 1057 (7th Cir. 2000); Doe v. Cunningham, 30 F.3d 879, 881 (7th Cir. 1994). Moreover, to the extent that an objection is non-responsive to the proposed finding of fact, the objection does not create a dispute of fact. An affidavit submitted to support or to oppose a summary judgment motion "must be made on personal knowledge, set forth facts that would be admissible in evidence and show that the affiant is competent to testify on the matters stated." Fed. R. Civ. P. 56(e)(1). "It is well-settled that conclusory allegations . . . without support in the record, do not create a triable issue of fact." Hall v. Bodine Elec. Co., 276 F.3d 345, 354 (7th Cir. 2002) (citing Patterson v. Chicago Ass'n for Retarded Citizens, 150 F.3d 719, 724 [7th Cir. 1998]). A finding of fact based on an affidavit which contains conclusory legal statements and is barren of any relevant facts of which the affiant has personal knowledge is not proper under Rule 56(e). See Resolution Trust Corp. v. Juergens, 965 F.2d 149, 152-53 (7th Cir. 1992). Such unsupported conclusory allegations have not been included in the relevant undisputed facts.

## RELEVANT UNDISPUTED FACTS

At all relevant times, the plaintiff was an employee of defendant Board of Regents of the University of Wisconsin System (Board of Regents), serving as an assistant professor in the Department of Sociology/Anthropology (Department) at the University of Wisconsin - Parkside (UW-Parkside). She was hired on April 21, 1999, as an academic staff member. The plaintiff's appointment was for a two-year term. She was employed at UW-Parkside from the 1999-2000 school year until the conclusion of the 2004-2005 school year. In February of 2004, the plaintiff

- 3 -

was formally notified that her contract as an assistant professor in the Department would not be renewed. The plaintiff is African American by race and her national origin is Haitian.

Defendant Board of Regents is a subdivision of the State of Wisconsin responsible for the overall operation of the University of Wisconsin System, including UW-Parkside. At all material times, the Board of Regents was the plaintiff's employer. Pursuant to Wis. Stat. § 36.05, and Wis. Admin. Code, § UWS 3.06, the Department of Sociology/Anthropology, through its Executive Committee, and the Chancellor at UW-Parkside had effective decision–making authority regarding the appointment of the plaintiff to the faculty at UW-Parkside and its periodic renewal.

Defendant Helen Rosenberg is employed by UW-Parkside as an associate professor in the Department of Sociology/Anthropology and has been so employed since 1991. At all material times, she was a managerial and supervisory employee. She was a member of the Department's Executive Committee in academic year 1999-2000, but was on sabbatical at the time and played no role in hiring the plaintiff. Defendant Rosenberg was elected chairperson of the Department in July of 2002. Her predecessor was Mary Kay Schleiter.

Defendant Anne Statham is on leave from UW-Parkside where she was a professor in the Department of Sociology/Anthropology and has been employed since 1982. She is currently employed by the University of Southern Indiana, Evansville, Indiana, where she teaches sociology and is initiating a service learning program. At all material times she was a member of the Department's Executive Committee, an assigned mentor to the plaintiff and a close colleague of defendant Rosenberg, chairperson of the Department.

- 4 -

The Executive Committee is comprised of all tenured faculty of the Department. For the period subject to this action, the members of the Executive Committee were defendant Rosenberg, defendant Statham, Mary Kay Schleiter, Gerhard Schutte, Lillian Trager and George Wang.

During the time defendant Rosenberg was a member of the Sociology/Anthropology Department, there had been no black or African-American members of the faculty of the Department, prior to the hiring of the plaintiff. Defendant Rosenberg's response when asked this question was: "I'm going to guess no." (Deposition of Helen Rosenberg [Rosenberg Dep.] at 13). There have been no other faculty members who were African-American, Haitian-American or similar in appearance since the plaintiff was hired. The hiring of the plaintiff as a faculty member for the University may have been pursuant to a diversity or affirmative action plan of the University.

When the plaintiff was hired in April 1999, her offer of employment letter made clear that at the conclusion of the two-year appointment, contingent on departmental needs and budget, the position could be converted to a tenure-track position. The offer letter also made clear that the plaintiff's appointment was subject to the provisions of Chapters UWS 9-14 of the Wisconsin Administrative Code and the UW-Parkside Faculty Policies and Procedures (UWPF).

The University of Wisconsin System had implemented an affirmative action plan, Plan 2008 at the time the plaintiff was hired. The plan was designed to create diversity on System campuses by bringing in students and faculty of color with more diverse cultural and racial backgrounds. Under Plan 2008, a person of color would be favored over candidates with equal qualifications. To assist the plaintiff in becoming acclimated to the Department and to help her with her teaching, the Department assigned two faculty mentors from inside the Department, defendant Statham and Gerhard Schutte, and two from outside the Department, Michele Gee from the business school and James Kinchen from the music department.

- 5 -

The plaintiff received an interim review on March 7, 2000, in connection with her receipt of a merit salary increase. The review indicated that her student teaching evaluations were lower than the departmental average, but acknowledged that she was working to improve. The review also indicated that the Department anticipated publication of her two papers in progress.

By letter dated May 16, 2000, the plaintiff was appointed to the Department as an assistant professor, consistent with the understanding at the time of her hire. The offer of appointment was for an initial three-year period and was probationary to tenure. Her formal starting date for this appointment was August 20, 2000, and she was scheduled to receive consideration for tenure in the 2005-06 academic year. The letter set forth that the plaintiff would be responsible for teaching, scholarly/creative activity and service. The letter also informed her that the criteria and procedures for reappointment and tenure were available in the UW-Parkside Faculty Policies and Procedures.

In accordance with UWPF rules, all initial probationary tenure-track appointments are for a defined period, not to exceed three years and, unless credited with prior service in the initial letter of appointment, all probationary faculty must receive contract renewal before coming up for tenure. There is no obligation of reappointment for probationary faculty. Under UWPF (6.03 Special Consideration Applying to Initial Probationary Appointments), faculty may have periods of time excluded from their probationary period under certain circumstances. These circumstances include leaves of absence, sabbatical leave, teaching improvement assignments, childbirth or adoption, elder or dependent care obligation, disability or chronic illness, or any other circumstances beyond the control of the faculty member that impede his or her progress toward achieving tenure.

- 6 -

The plaintiff did not ask defendant Rosenberg to take time off due to any health issues. Defendant Rosenberg knew that the plaintiff had complained about fumes but she never realized that the plaintiff had serious health problems because the plaintiff was at the university and taught her classes. Defendant Rosenberg did not talk to the plaintiff about options regarding extending her probationary period. The plaintiff avers that defendant Rosenberg offered her a handicapped parking space. Defendant Stratham testified that in the spring of 2004, the plaintiff suffered from an undetermined illness and she may have encouraged her to get a handicap sticker for her car. Had the plaintiff wanted to extend her probationary period, it was required that she complete the process defined under UWPF 6.03(2) prior to the contractual beginning of her sixth probationary year. She filed no such request.

The plaintiff's first Progress Towards Tenure review dated March 15, 2001, was generally favorable. In the area of teaching, the Executive Committee noted the plaintiff's efforts to improve her teaching evaluations and concluded that she was making appropriate progress. In the area of research, the Executive Committee indicated that the plaintiff was making appropriate progress and that it was anticipating continued progress in her research program involving the self-preservation of racial identity.

In an October 3, 2001, memo to the Dean of the College of Letters and Science, Dr. Schleiter then chairperson of the Sociology/Anthropology Department, stated:

> In the experience of our department, teaching at UW-Parkside makes more intensive demands on faculty women of color. Some of our students do not treat these members of the faculty with respect. Therefore, the teaching process requires more work, and it may take a few semesters for women of color faculty to adjust to our student population. Yanick St. Jean experienced these difficulties among some students, particularly freshmen, when she came to UW Parkside, and therefore the Executive Committee advised her to spend her first three semesters focusing on her teaching. Her hard work on teaching, documented in her annual reviews, has resulted in more effectiveness. We are not satisfied that

- 7 -

her teaching meets the high standards of the department. In large part because of this effort, she is now behind in her research. Although she published a book and several articles before coming to UW-Parkside, her research program has not moved as quickly as expected since coming here. This endangers her progress towards tenure.

Both Plan 2008 and our Department Strategic Plan emphasizes the importance of <u>retention</u> of faculty of color. In accordance with this important goal, the Executive Committee tries to recognize and provide opportunities to correct potential problems early. We pay close attention to the progress of all of our tenure track faculty, but we also recognize the particular problems which can impede the progress of certain groups. Since we believe the lack of sufficient progress in this case is tied to our actions – the Executive Committee's recommendation to focus on teaching in the beginning – we feel particularly responsible in this case.

Therefore, we wish to give Professor St. Jean one course release during the spring semester.

(Affidavit of Yanick St. Jean [Plaintiff's Affidavit], ¶ 5, Exh. 15).

To assist the plaintiff in speeding the progress of her research, especially in achieving publication of the two papers on racial identity, in a letter dated October 26, 2001, the Executive Committee offered the plaintiff a course release for the spring 2002 semester. Under this arrangement, the plaintiff was authorized to teach two courses, rather than three courses, as is typical for probationary faculty. The idea was that the additional non-teaching time could be used by the plaintiff in preparing her two articles for publication. One of the two courses the plaintiff was assigned to teach was a research methods course with a focus group practicum. The plaintiff also was assigned seven to ten independent study students that semester.

Under the terms of the course release, the plaintiff agreed to revise and re-submit the two papers on racial identity by the end of the semester, to make significant progress on her new project, and to be in regular contact with her mentor on the two papers, Joe Feagin of the University of Florida, during the term of the release. The plaintiff submitted the two articles to

- 8 -

journals for review, but they were returned to her. The plaintiff revised one of the papers and resubmitted it to <u>Symbolic Interaction</u>, a peer reviewed journal, during the time she had the course release. One of the papers needed new data which the plaintiff did not have and needed to collect, but she did not have the funds to do so.

When the plaintiff came up for contract renewal in the spring 2002 semester, Dr. Schleiter sent the plaintiff an email on February 22, 2002, to remind her she had agreed to report to the Executive Committee on her progress on the two papers under revision. On March 1, 2002, the Executive Committee voted unanimously to renew the plaintiff's contract for two years.

In March of 2002, there was an incident with a student in one of the plaintiff's classes. Defendant Rosenberg could not say that it was inappropriate that the police were called to remove a student from one of the plaintiff's classes. She never asked the plaintiff about the police being called and the plaintiff denied that she called the police. The incident was not an indication that the plaintiff's teaching was not up to standard and defendant Rosenberg did not consider that when later she decided to vote for non-renewal of the plaintiff's contract.

Also during the 2002 spring semester, defendant Rosenberg, as Department chairperson, began to receive some specific complaints from students about the plaintiff's teaching. For every teacher there will be some students who criticize them. Not all criticisms of teachers are fair criticisms. There are some students that like a teacher and there are some who do not. There are some students who are critical of the teacher and some who are not. Defendant Rosenberg did not feel that the plaintiff received an inordinate amount of criticism or praise from her students.

As early as March 2002, the plaintiff was notified that her teaching did not meet the standards of the Department. As early as 2002, the Executive Committee expressed its

- 9 -

concerns about the progress of the plaintiff's research which could negatively impact her chance for contract renewal and tenure.

The plaintiff was advised in her second Progress Toward Tenure review dated March 29, 2002, that she had not achieved adequate progress towards tenure in research and that the Department was not confident that she had instituted a research program which would yield a sufficient level of research productivity by the Spring of 2006. The review concluded that the plaintiff''s progress toward tenure was weak, but that the Department was hopeful that she could make the necessary changes to succeed.

Defendant Rosenberg replaced Mary Kay Schleiter as Department chairperson for the 2002-03 academic year. During the 2002-2003 academic year, the Department continued to provide the plaintiff with feedback. In the plaintiff's February 2003 Merit Salary Increase Recommendation, with regard to "Teaching," the plaintiff received a score of 2.5: "Shows improvement". (Plaintiff's Dep. Exh. 15). She received a score in "Research" of 2.0; "Needs Improvement" and a score in "Service" of 3.0; "Solid." Id. Her overall scores for teaching, research and service were 2.5, below the Department average of 3.0. There was no issue about the plaintiff fulfilling the service component of the requirements for tenure. The plaintiff's contract was subsequently renewed through the 2004-05 academic year.

In previous years, the Executive Committee had agreed that everyone in the Department would get the same numeric score (3.0) for purposes of merit consideration. However, when some Department faculty were performing below par, the Committee determined that the rating system had to accurately reflect the true performance of people in the Department. Dr. George Wang also scored below average because he refused to teach one of his classes. Dr. Wang and the plaintiff were the only two who scored below average. Dr. Wang and the plaintiff, the

- 10 -

two faculty of color and non-American born, were the only two who did not receive a merit increase when the Executive Committee changed the rules regarding merit increases.

The plaintiff's March 24, 2003, Progress Towards Tenure review stated that the plaintiff had received ratings at the 2 level or below (on a 5-point scale with five being the highest in teaching) on factors such as explaining the importance of the subject matter, being clear about the objectives of the course, and being organized in class presentations. The plaintiff disputes these conclusions in the report. The report also notified the plaintiff that she needed to make progress toward publishing the results of her research. The Executive Committee encouraged the plaintiff to focus her efforts on getting published in peer-reviewed journals, rather than undertaking the publication of a book that would not be fruitful in time for her contract renewal in the 2004-05 academic year.

In a subsequent memo dated May 8, 2003, which summarized its suggestions for improving her progress toward tenure and contract renewal, the Executive Committee reiterated the basis for its concerns regarding the plaintiff's teaching and research. The May 8, 2003, memo drew a critical distinction between data collection, which the plaintiff continued to do by conducting interviews, and research output in the form of publication in peer-reviewed journals. The memo specifically stated that the Executive Committee would examine her research output in consideration of contract renewal and/or tenure. A lack of publications from a research process can only be evaluated as non-productive and is not considered appropriate for recommendation of contract renewal and/or tenure. Many members of the Executive Committee were uncomfortable with the plaintiff's research into the effects of religion on attitudes toward race and ethnicity.

- 11 -

In response to a handwritten note dated June 18, 2003, to defendant Rosenberg from the plaintiff, the Executive Committee conducted a survey of students' opinions and recommendations regarding their experiences in the plaintiff's classes. By memo dated October 8, 2003, defendant Rosenberg communicated the results of that evaluation to the plaintiff. The survey revealed several good points and comments about the plaintiff's teaching, but also echoed the Department's previous concerns.

Neither defendant Rosenberg nor defendant Statham ever visited the plaintiff's class. Defendant Rosenberg never gave the plaintiff advice on how to deal with problem students.

Dr. Statham, at times, served as a mentor to the plaintiff and encouraged her to focus on her work. However, Dr. Statham was Outreach Administrator for the UW Women Studies Consortium and was away from campus a lot of the time. Dr. Statham also served as the Director of the Institute for Community-based Learning on a half-time basis. There was a period when Dr. Statham met with the plaintiff almost weekly.

The plaintiff also was mentored by James Kinchen and Gerhard Schutte. The role of a mentor is to coach, advise and make suggestions to help faculty achieve their goals. Ultimately, however, it is the responsibility of the individual to make sure they achieve those goals. Dr. Schutte's chief concern was the plaintiff's level of productivity and its impact on her upcoming consideration for contract renewal. At the time, the plaintiff had research work in progress and had presented it at conferences.

Dr. Statham supported the plaintiff's endeavor to research and write a book, but she advised the plaintiff that she would be better off devoting time to smaller projects whereby she could quickly send things out for publication, given the length of time it takes to do research, analyze data, and

- 12 -

get a book published.  The plaintiff thought she could produce a book with less difficulty than collecting new qualitative data for one article.

It is the role of the Department chairperson to advise and assist faculty with assembling and reviewing the materials they present to the Executive Committee in support of consideration for contract renewal or tenure.  Dr. Rosenberg spent a considerable amount of time with the text of the plaintiff's tenure file, but spent little time on what actually went into the file, such as articles and student evaluations.  Defendant Rosenberg assisted both the plaintiff and Patrick Goldsmith with their file preparation.  Patrick Goldsmith was also hired in 1999 as an assistant professor in the Department.   He came up and was granted tenure at nearly the same time as the plaintiff.   His teaching record was better than the plaintiff's and he had an excellent research record.

The only source of information the Executive Committee had about the plaintiff's teaching skills came from students, either in the form of evaluations by students or complaints from them. The evaluations query students about whether they learned something from the particular class. The Executive Committee thought the plaintiff's teaching was deficient because the numeric scores on her teaching evaluations by students were fairly low and lower than the average.

In addition to the student evaluations approved by the Department, the plaintiff distributed her own evaluation forms to the students which they completed while she was in the room.  The Executive Committee did not consider the self-evaluations filled out by the students which the plaintiff said showed that students reported learning a lot in her classroom.

UWPF 6.01(3) states that quality shall be considered more important than quantity in the evaluation of creative and scholarly activity and a broad definition of such activity may be employed. UWPF 6.01 also provides:  "[T]here should be evidence of continuing activity." (Rosenberg Dep. at 65.)

- 13 -

Tenure candidates may receive credit for publications even though the articles they have authored or the chapter that they are working on have not yet been actually published if they submit manuscripts of the articles that are in press and going to be published to the Executive Committee for review and evaluation. The plaintiff was never considered for tenure because her contract was not renewed a year prior to the time that she was supposed to be considered for tenure. A book chapter that has been accepted for publication would be considered a publication worthy of merit for tenure purposes. The Executive Committee generally looked for about six publications in order for a candidate to meet the standard regarding publishing for tenure. However, exceptions are made for faculty who publish in top quality journals.

Defendant Rosenberg knew that the plaintiff was seeking a book contract from the University Press of America. Defendant Rosenberg also knew that the plaintiff had submitted articles to a number of journals and that one journal took over a year to give the plaintiff feedback. Defendant Rosenberg was aware that the plaintiff had presented a teaching workshop at UW-Parkside and maybe another one at another campus. The plaintiff produced no research output in the form of publication during the time she was employed at UW-Parkside.

On January 30, 2004, the Executive Committee met in closed session to consider whether the plaintiff's probationary contract should be renewed beyond the 2004-05 academic year. Of the five committee members present, four voted for non-renewal and one member abstained. Dean Donald Cress notified the plaintiff of her non-renewal by letter dated February 11, 2004.

Subsequently, the plaintiff requested a statement of reasons for the non-renewal, which was provided to her. She also was granted reconsideration of the non-renewal decision, according to UWPF 6.07, but the non-renewal was upheld. Just prior to submitting her request for reconsideration of her contract non-renewal, the plaintiff entered into a contract with the University

- 14 -

Press of America for publishing her book on sacramental imagination. She provided a copy of the contact to the Department with her request for reconsideration. However, the new book contract was not accompanied by a completed manuscript for review.

After a hearing and consideration of a materials provided by UW-Parkside and the plaintiff, the Faculty Rights and Responsibilities Committee (FRRC), a nine-member committee of faculty members from across the institution, determined that the plaintiff's non-renewal was justified and not tainted by improper factors. The FRRC concluded that the Executive Committee did not improperly look at the plaintiff's race, color or national origin in its non-renewal decision, nor did it fail to accommodate the plaintiff's disability. There were no African-Americans or people from other racial minorities on the Executive Committee.

## ANALYSIS

### Title VII, § 1981 and § 1983 Equal Protection Claims

The plaintiff asserts that her contract as an associate professor in the tenure track was not renewed in February of 2004, on account of her national origin, color, and race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended, 42 U.S.C. § 1981 and the Equal Protection Clause of the Fourteenth Amendment.

In moving for summary judgment, the defendants maintain that there is no direct evidence of any discriminatory motive for the decision not to renew the plaintiff's contract. The defendants further assert that the plaintiff cannot establish a prima facie case of discrimination based on race, color or national origin because she cannot demonstrate either that her performance was meeting the university's legitimate expectations or that similarly situated Caucasian faculty were treated more favorably.

- 15 -

In response, the plaintiff asserts that she has produced sufficient facts to put into contest each element of the prima facie case and to create an inference that the defendants' asserted non-discriminatory reason for terminating her is false and actually a pretext for discrimination. Specifically, the plaintiff asserts that the defendants failed to show there is no evidence by which the plaintiff could establish that she was performing adequately or that she was treated differently than others not members of her protected class. She also asserts that because she was replaced by someone not a member of her protected class, she satisfies the fourth element of the burden-shifting method outlined by the Supreme Court. The plaintiff maintains that "[t]he fact that defendants did not do more to position [her] for success in the tenure track, to help [her] overcome discriminatory resistance to her progress, and, instead, aborted [her] probationary status with two full years left to go in her tenure track, gives rise to an inference that defendants had a discriminatory motive in non-renewing her contract." (Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment [Plaintiff's Brief] at 12-13).

Title VII makes it unlawful for an employer to ". . . discharge any individual, or otherwise to discriminate against any individual with respect to [her] compensation, terms, conditions, or privileges of employment, because of such individual's race, color, . . . or national origin." 42 U.S.C. § 2000e-2(a)(1). Section 1981 provides that "all persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, as is enjoyed by white citizens. . . ." As defined in § 1981, the term, "make and enforce contracts," includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 42 U.S.C. § 1981(b). A prima facie case of race discrimination under § 1981 is predicted on the same elements as a claim under Title VII and, therefore, the court analyzes them together. See Lalvani v. Cook County, Illinois, 269

- 16 -

F.3d 785, 789 (7th Cir. 2001). Section 1983 equal protection claims are also analyzed under the same legal standard applicable to Title VII claims. See Williams v. Seniff, 342 F.3d 774, 787-88 (7th Cir. 2003) (citing cases). "The only difference is that a Title VII claim is against an employer, while an equal protection claim is against individual employees." Salas v. Wis. Dep't of Corr., 493 F.3d 913, 926 (7th Cir. 2007) (citing Hildebrandt v. Ill. Dep't of Natural Res., 347 F.3d 1014, 1036 [7th Cir. 2003]).

A plaintiff in a discrimination case may prove intentional discrimination by using either the "direct method" or the "indirect method." See Rhodes v. Illinois Dept. of Transp., 359 F.3d 498, 504 (7th Cir. 2004). "Evidence which in and of itself suggests that the person or persons with the power to hire, fire, promote and demote the plaintiff were animated by an illegal employment criterion amounts to direct proof of discrimination." Venters v. City of Delphi, 123 F.3d 956, 972 (7th Cir. 1997). The evidence may be direct or circumstantial. Rhodes, 359 F.3d at 504. However, a proffer of direct evidence must relate to the specific employment decision in question. Plair v. E.J. Brach & Sons, Inc., 105 F.3d 343, 347 (7th Cir. 1997).

The indirect method requires that the plaintiff apply the burden-shifting method outlined by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) and Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248 (1981); see also, Kirk v. Federal Property Management Corp., 22 F.3d 135, 138 (7th Cir. 1994). Initially, the burden is on the plaintiff to establish a prima facie case of discrimination.

In this case, the plaintiff relies on the indirect method of proof. Under this indirect method of proof, to establish a prima facie case of discrimination, the plaintiff must show: 1) that she belongs to a protected group; 2) that she performed the job satisfactorily; 3) that she suffered an adverse employment action; and 4) that the employer treated similarly situated employees outside

the protected group more favorably.  <u>Maarouf  v. Walker Mfg. Co., Div. of Tenneco Automotive, Inc.</u>, 210 F.3d 750, 752 (7th Cir. 2000) (citing <u>Stalter v. Wal-Mart Stores, Inc.</u>, 195 F.3d 285, 289 [7th Cir. 1999]).  If the plaintiff establishes all the elements of a <u>prima</u> <u>facie</u> case, the plaintiff raises an inference of discrimination.  <u>See</u> <u>Lenoir v. Roll Coater, Inc.</u>, 13 F.3d 1130, 1132 (7th Cir. 1994).

Once the plaintiff establishes a <u>prima</u> <u>facie</u> case, the burden then shifts to the defendant to produce a legitimate, nondiscriminatory reason for the challenged employment decision.  Finally, if the defendant produces a legitimate, nondiscriminatory reason for its employment decision, the burden shifts back to the plaintiff to show that the legitimate, nondiscriminatory reason was pretextual.  <u>See</u> <u>Kirk</u>, 22 F.3d at 138.  The plaintiff may prove pretext directly by showing that "a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered reason [for the adverse employment action] is unworthy of credence." <u>Billups v. Methodist Hosp. of Chicago</u>, 922 F.2d 1300, 1303 (7th Cir. 1991) (citing <u>Texas Dept. of Community Affairs v. Burdine</u>, 450 U.S. 248, 256 [1981]).

The plaintiff is an African-American woman and her national origin is Haitian.  Thus, she belongs to a protected group.  Additionally, the plaintiff suffered an adverse employment action when her contract with UW-Parkside was not renewed.  To establish a <u>prima</u> <u>facie</u> case of discrimination under Title VII, § 1981 and the Equal Protection Clause, however, the plaintiff also must show that overall she was performing her job satisfactorily and that the defendant treated other similarly situated employees outside the protected group more favorably.

The plaintiff maintains that she was meeting her job expectations.  Specifically, the plaintiff asserts that she was diligently conducting research and making every effort to have it published. The plaintiff further asserts that the "[d]efendants have not shown that there is no evidence that would support the likelihood that she would have been able to garner a sufficient number of

- 18 -

qualifying publications as of the time of her consideration for tenure." (Plaintiff's Brief at 6-7). The plaintiff also contends that the defendants' use of student evaluations as the primary criterion for evaluating her teaching performance was unreliable and discriminatory and that the Executive Committee relied on those student evaluations to the "virtual exclusion of other pertinent criteria to evaluate [the plaintiff's] teaching performance." Id. at 8.

However, the plaintiff's assertions are belied by the undisputed facts which show that the plaintiff was experiencing problems with her teaching from 2002 until her non-renewal in 2004. As early as March 2002, the plaintiff was notified that her teaching failed to meet the standards of the Department. The Department based its assessment on student evaluations regarding the plaintiff's skills. The plaintiff's numeric scores on the evaluations were fairly low and lower than the average in the Department. The undisputed facts also establish that during the 2002 spring semester students began voicing grievances about the plaintiff's teaching and her grading system.

In the plaintiff's February 2003 Merit Salary Increase Recommendation, with regard to "Teaching," the plaintiff received a score of 2.5: "Shows improvement." (Plaintiff's Dep. Exh. 15). As a result of the plaintiff's scores, she did not receive a merit pay increase that year. In a memo dated May 8, 2003, the Executive Committee provided suggestions to the plaintiff for improving her performance toward tenure and contract renewal. The Committee also reiterated its concerns with the plaintiff regarding her teaching and research.

The undisputed facts also establish that the plaintiff failed to satisfy the university's standards for research. The plaintiff failed to publish anything while employed at the UW-Parkside. During the plaintiff's interim review on March 7, 2000, the Executive Committee indicated that it anticipated publication of her two papers in progress. Again on March 15, 2001, in her Progress Towards Tenure review, the Executive Committee indicated that it was expecting continued

- 19 -

progress in her research program involving the self-preservation of racial identity. In fact, the Committee granted the plaintiff a course release for the Spring 2002 semester to assist the plaintiff in speeding the progress of her research.

Under the terms of the course release, the plaintiff agreed to revise and re-submit her two papers on racial identity by the end of the semester, to be in regular contact with her mentor on the two papers and to make significant progress on her new project. The plaintiff only revised one of the papers and resubmitted it for publication during the time of her course release.

Although the Department renewed the plaintiff's contract for two years, the plaintiff's second Progress Toward Tenure review dated March 29, 2002, indicated that the plaintiff had not achieved adequate progress towards tenure in research. The review also advised that the Department was not confident that the plaintiff had instituted a research program which would result in a sufficient level of research productivity by the Spring of 2006. Although the review concluded that the plaintiff''s progress toward tenure was weak, the review stated that the Department was hopeful that she could make the necessary changes to succeed.

Nevertheless, the undisputed facts establish that the plaintiff's research still was not progressing. In the March 24, 2003, Progress Towards Tenure report, the Department told the plaintiff that she needed to make progress towards publishing the results of her research because she had not published any work from her research since arriving at UW-Parkside. The Department was also concerned that the plaintiff had not succeeded in publishing papers in her prior research areas for which she had received the course release in 2002. The plaintiff was encouraged to focus her efforts on getting published in peer-reviewed journals, rather than attempt to publish a book manuscript that would not be completed prior to her contract renewal in the 2004-05 academic year.

- 20 -

The May 8, 2003, memo from the Executive Committee to the plaintiff reiterated the Committee's concerns about her research and specifically stated that the Executive Committee would examine her research output in consideration of contract renewal and/or tenure. A lack of publications from a research process can only be evaluated as non-productive and is not considered appropriate for recommendation of contract renewal and/or tenure.

In this case, the undisputed facts establish that the plaintiff was not meeting her job expectations prior to contract non-renewal. Moreover, even if the plaintiff could establish that she was meeting her job expectations, she cannot establish that the defendants treated similarly situated employees outside the protected group more favorably.

The only similarly situated person identified by the plaintiff is Dr. Patrick Goldsmith, who also was hired in 1999 as an assistant professor in the Department. The undisputed facts establish, however, that Dr. Goldsmith's teaching record was superior to the plaintiff's and his research record was excellent.[2]

The court has construed the relevant undisputed facts in the light most favorable to the plaintiff. Nonetheless, based on those undisputed facts, this court concludes that the plaintiff has failed to establish a prima facie claim of discrimination under either Title VII, § 1981 or the Equal Protection clause. Therefore, the defendants' motion for summary judgment on these claims will be granted.

---

[2]No proposed facts were submitted by either party with regard to Roger Ohr, the person the plaintiff asserts replaced her.

**§ 1983 Due Process Claim**

The defendants' motion for summary judgment does not address the plaintiff's § 1983 due process claim. Nevertheless, the undisputed facts establish that the plaintiff did not have a protected property interest in her position as an assistant professor at the UW-Parkside.

To determine whether a plaintiff has a due process right under the Fourteenth Amendment, it must first be determined whether the plaintiff has a protected property interest as a matter of substantive law. See Board of Regents v. Roth, 408 U.S. 564, 570-71 (1972); Fittshur v. Village of Menomonee Falls, 31 F.3d 1401, 1405 (7th Cir. 1994). The existence of a substantive property interest in public employment is ordinarily a question of state law:

> Property interests, of course are not created by the Constitution. Rather, they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

Roth, 408 U.S. at 577. "To establish a protectable property interest, a plaintiff must be able to point to a substantive state-law predicate creating that interest." Omosegbon v. Wells, 335 F.3d 668, 674 (7th Cir. 2003) (citing Roth, 408 U.S. at 577). In the employment context, the court of appeals for this circuit has "generally required that a plaintiff be able to show that the terms of her employment provide for termination only 'for cause' or otherwise evince 'mutually explicit understandings' of continued employment." Omosegbon, 335 F.3d at 674 (internal citations omitted).

In this case, the undisputed facts establish that the plaintiff was hired on April 21, 1999, as an academic staff member. In August of 2000, the plaintiff was appointed to the Department as an assistant professor. The offer of appointment was for an initial three-year period and was probationary to tenure. The undisputed facts further establish that the defendants were under no obligation to reappoint probationary faculty such as the plaintiff. According to the undisputed facts,

- 22 -

all probationary faculty are required to receive contract renewal before coming up for tenure, unless the person is credited with prior service in the initial letter of appointment. The plaintiff was never considered for tenure because her contract was not reviewed the year before she was to be considered for tenure. As a non-tenured assistant professor, the plaintiff had no protected property interest in her position beyond the term of her contract. See Roth, 408 U.S. at 567. Accordingly, the plaintiff's 42 U.S.C. § 1983 due process claim will be dismissed.

In sum, the plaintiff has not established a prima facie case of discrimination under Title VII or §1981. She also has not established a property interest in her position beyond the term of the contact. Accordingly, the defendants' motion for summary judgment will be granted.

## ORDER

**NOW, THEREFORE, IT IS ORDERED** that the defendants' motion for summary judgment be and hereby is **granted** (Docket # 39).

**IT IS FURTHER ORDERED** that the plaintiff's 42 U.S.C. § 1983 due process claim be and hereby is dismissed.

**IT IS ALSO ORDERED** that this action be and hereby is **dismissed**.

**FINALLY, IT IS ORDERED** that the clerk of court enter judgment accordingly.

Dated at Milwaukee, Wisconsin this 26th day of January, 2010.

BY THE COURT:

\_\_\_\_s/ Patricia J. Gorence\_\_\_\_
PATRICIA J. GORENCE
United States Magistrate Judge

O:\CIV\st. jean sj.wpd

- 23 -